454    Appellate Courts of Illinois.

Illinois-Indiana Fair Association v. Phillips, 241 Ill. App. 454.

---

## Illinois-Indiana Fair Association, Appellant, v. George A. Phillips, Appellee.

### Gen. No. 7,968.

1. Sales—*sufficiency of evidence to support finding that purchase of corporate stock was a transaction within Cahill's St. ch. 121a, ¶ 7.* Evidence in an action upon a note alleged to have been given in payment for stock of a corporation held to support a finding that no portion of the purchase price of such stock had been paid, that the purchaser had never accepted any portion of the stock so purchased, and that the transaction therefore came within Cahill's St. ch. 121a, ¶ 7.

2. Appeal and error—*conclusiveness of findings of court trying case without jury, upon controverted questions of fact.* The findings of a judge to whom a cause is submitted for trial without a jury are entitled to as much weight, upon controverted questions of fact, as the verdict of a jury, and will not be set aside by a court of review unless manifestly against the weight of the evidence.

3. Corporations—*actual or issued stock defined.* Actual, or issued, stock is stock which has been subscribed for and which has been paid in, or is subject, under legal compulsion, to be paid in, but it is not necessary that the actual certificate shall have been issued.

4. SALES—*sufficiency of evidence to show note given in payment of subscription for unissued corporate stock.* Evidence in an action upon a note alleged to have been given in payment for corporate stock held not to show that such note was given in payment of a subscription for unissued stock, but actual, issued and existing stock.

5. SALES—*giving of promissory note as payment of purchase price of actual, issued stock of a corporation.* The giving of a promissory note for actual, issued stock of a corporation is not a payment of the purchase price or any part thereof, within Cahill's St. ch. 121a, ¶ 7.

Appeal by plaintiff from the Circuit Court of Vermilion county; the Hon. JOHN H. MARSHALL, Judge, presiding. Heard in this court at the April term, 1926. Affirmed. Opinion filed July 1, 1926.

CHARLES TROUP, for appellant.

O. B. DOBBINS and HAROLD F. LINDLEY, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

The issue raised in this case is substantially one of law as to the construction to be given to the first clause of section 4 of the Uniform Sales Act [Cahill's St. ch. 121a, ¶ 7], providing that:

"A contract to sell or a sale of any goods or choses in action of the value of $500 or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

Does this statute of frauds, under the Uniform Sales Act, apply to a sale of shares of stock in a corporation, and under the facts in this case did appellee accept part of the shares of stock claimed to have been sold him by appellant? No other questions are raised upon this record.

On October 21, 1919, appellee executed his promissory note for the principle sum of $1,000, payable to the order of appellant, the principal payable in equal annual instalments of $200 each on November 1, 1920, 1921, 1922, 1923 and 1924, respectively, with interest at the rate of six per cent, payable annually, and, if not paid when due, a reasonable attorney's fee. Appellee caused the note to be delivered to appellant. The transaction grew out of the affairs of appellant corporation which had been incorporated in 1917, with a capital stock of $2,500. In the early part of 1919, appellant, in carrying on its activities, had incurred an indebtedness of over $100,000 and certain of its members and stockholders had become security for and personally responsible for this indebtedness by giving their notes therefor. Thereafter, a plan was conceived by the Chamber of Commerce of Danville, which was interested in maintaining the Interstate Fair at Danville, to have 135 prominent citizens of Danville underwrite $135,000 worth of the capital stock of appellant corporation to take care of this indebtedness and to supply some additional funds for appellant. Accordingly, in March and April, 1919, an underwriting agreement was gotten up and 135 signatures secured thereto, appellee's among the number. This underwriting agreement provided that the parties signing the agreement underwrite the sale of $135,000 of capital stock of the Illinois-Indiana Fair Association for the corporation increasing its stock and waiving notice of the stockholders' and directors' meetings for the purpose of such increase; for a stock selling campaign to last at least 30 days to sell this $135,000 worth of capital stock; that each signer should pay only for his pro rata share of the part of the stock remaining unsold after said 30 days' campaign; that in the event that any of the signers of the agreement were required to purchase any stock remaining, they should have the right to pay for the same at the rate

of $200 a year, by giving their notes, with interest at six per cent per annum from the date of such purchase.

The 135 subscribers had all affixed their signatures to the agreement prior to April 19, 1919. Thereafter, in pursuance of the terms of the agreement, appellant held a special meeting of its stockholders on May 31, 1919, and passed resolutions increasing the capital stock of the corporation from $75,000, to which it had been increased, to $200,000, and its shares to 8,000 in number. It is claimed by appellee that at the time the underwriting agreement was signed and up to July 3, 1919, appellant had taken no steps to qualify the additional stock under the Illinois Securities Act [Cahill's St. ch. 32, ¶ 254 et seq.], known as the "Blue Sky" law, with the secretary of State. The stock selling campaign started July 14, 1919, and did not meet with much success. Appellee with some three or four others of the signers formed a team and sold some stock. Altogether there were $13,500 in stock sold. There is some conflict in the evidence as to just what took place when appellee signed and delivered the $1,000 note which we shall discuss.

In December, 1919, appellee brought to appellant's office further stock subscriptions to the amount of $325, with $50 in cash, $50 in Liberty bonds and a note for $25 of one Paul Atherton, and it is claimed by appellant that appellee then directed the assistant secretary of appellant to issue stock for the money, note and bonds to the subscribers out of the stock for which appellee had subscribed and to give him credit upon his note. Thereupon, four shares of stock were issued direct to the subscribers who had paid the money and furnished the bond, but no credit was given to appellee, and upon this state of affairs appellant insists that appellee accepted a part of the goods and choses in action, which takes the transaction out from the operation of the statute of frauds. This we shall refer to later. No stock was ever tendered to appellee until

the principal of the note was wholly due and shortly before the commencement of this suit. No payments were ever made by appellee upon the note except as herein set forth and except the Atherton note which was paid, and one share of stock issued to him.

Appellant's suit is brought upon special count based upon the note. Appellee filed various pleas. The fifth avers that appellee did procure subscriptions of stock of said plaintiff, amounting to the sum of $1,000, which subscriptions were delivered to the plaintiff and accepted by the plaintiff as performance by the defendant of his underwriting agreement, as set forth, whereby the said note became and was fully discharged and satisfied. To this plea appellant replied, after setting out the underwriting agreement, that after said stock selling campaign was ended the defendant with full knowledge of all of the said facts, then and there purchased of the plaintiff corporation 40 shares of the capital stock of the plaintiff corporation of the par value of $25 each, and made and delivered to the plaintiff his promissory note in payment of the same, as set forth in the declaration; and that thereupon the plaintiff received said promissory note as the purchase price of said 40 shares of stock, etc. To this replication appellee by rejoinders pleaded the statute of frauds and that he never purchased the said 40 shares of stock. To the first rejoinder appellant by surrejoinder pleaded that appellee did accept part of the goods or choses in action so contracted to be sold or sold and actually received the same and gave something in earnest to bind the contract or in part payment, and that a note or memorandum in writing of the contract or sale signed by the defendant was given.

Issue was taken upon appellee's second rejoinder and upon appellant's sur-rejoinder. A jury was waived. The court heard proofs and there was a finding and judgment for defendant. Appellee and appellant have appealed.

We have set out the pleadings to show just what the issues were in the court below and what issues are presented to this court. Appellant has cited authorities and made an extended argument upon the basis that a stock subscription for unissued and unauthorized stock does not come within the ban of the statute of frauds in the Uniform Sales Act [Cahill's St. ch. 121a, ¶ 4 *et seq.*]. That question was not at issue in the court below and is not one of the issues here.

There were two issues of fact in the case. Appellee testified that at the time he signed the note the arrangement was that he was to have credit upon the note for the sales of stock he had made. Appellee, with others, had constituted a team in selling stock and they had made sales, amounting substantially to the amount of their subscriptions. Appellee testified that the president of the chamber of commerce had promised him that these sales should be credited upon his subscription, which would have varied the terms of the underwriting agreement. In any event, appellee was entitled to a credit of $100 upon his subscription on the total sales made. In behalf of appellant, however, the witnesses McCray and Hartshorn, who secured the note from appellee, testified: "We took the note down there and told Mr. Phillips that there was $13,500 worth of stock sold in this campaign and he was entitled to $100, but there were quite a few people that were not able to carry the $1,000 and that he was interested in the fair and that we thought he was able to carry $1,000 and, if he was, we would like him to take $1,000 worth of stock or 40 shares so we could relieve some of the fellows on the notes that were not able to carry them, and he just turned the note over and signed it without any question. We said something to him about the stock selling campaign being over at that time." The witnesses further denied that at that time or any other time anything was said to appellee about the "pro rata" being taken care of

460    APPELLATE COURTS OF ILLINOIS.

Illinois-Indiana Fair Association v. Phillips, 241 Ill. App. 454.

later on, as appellee had testified. The chancellor made a finding in the court below which is part of the record. He found that appellee (defendant) from the preponderance of the evidence gave the note in question, not under any prior contract, but as an independent agreement to purchase 40 shares of stock at $25 per share. This finding is in exact accord with appellant's second replication to the fifth plea and should be conclusive. As to appellee's accepting part of the stock purchased or sold and making a payment upon the same, appellee testified that he took the subscriptions, cash, bond and note to Mr. Tate, the secretary, and that he told Tate to give him credit for the amounts upon his note. Tate testified that when appellee brought in these subscriptions he wanted credit upon his stock subscription or note and that he told appellee he had no authority to give any credit on notes until he conferred with the officers or board of directors. Stock was issued to the subscribers, as presented by appellee, who had paid cash and the Liberty bonds, and to Atherton upon the payment of his note, but appellee was not allowed credit upon his note for any of the subscriptions. Upon this issue of fact, part payment or acceptance of a portion of the stock, the chancellor held that the burden of proof was upon appellant and tersely held: "Tate was interested in getting the money for the stock solely. Mr. Phillips was solely interested in reducing a liability, which he then believed he would sometime have to meet. If Tate had positively testified on the exact point in irreconcilable contradiction to Phillips, there would be no preponderance, for the credibility of both witnesses stands unimpeached. The circumstances add nothing to plaintiff's contention on the question of part performance. The title to the shares was not in Phillips. If Tate understood Phillips was selling his own stock, it might be expected that he would inform Phillips that it was a matter of indifference to the plaintiff

whether Phillips transferred any or all of his stock. It appears from the evidence that the defendant was a man of considerable financial means. His note might have been accepted by plaintiff as payment for the stock, but it was not so accepted. Tate was insisting upon payment before the stock was issued. Phillips brought in money and collateral in payment of five shares and he issued the five shares to the parties paying for it. His interest went no further. Tate did not give Phillips credit upon his note. The transaction on its face appears to be merely the report of a stock selling solicitor to the responsible officer of the corporation. To justify a holding that the transaction was of an essentially different character, requires proof that both parties so understood it and so intended."

The court held that the testimony failed to show that appellee had paid a portion of the purchase price of the stock for which the note was given, or had accepted any of the stock and that the transaction came within the statute of frauds. We have examined the testimony and read the record and it seems to support the finding of facts made by the chancellor. The finding of a judge, to whom a cause is submitted for trial without a jury, is entitled to as much weight on controverted questions of fact as the verdict of a jury, and will not be set aside by a court of review unless it is manifestly against the weight of the evidence. *Haug v. Haug,* 193 Ill. 645; *Johnson v. McNellis,* 228 Ill. 351; *Caruthers v. Reesor,* 134 Ill. App. 370; *Hess v. Killebrew,* 209 Ill. 193; *Schumacher v. Wolf,* 125 Ill. App. 81.

Shares of stock, by practically all authorities, have been treated as choses in action (14 C. J. 389), and have been held to be choses in action in this State. *First Nat. Bank of Mendota v. Smith,* 65 Ill. 55; *Banta v. City of Chicago,* 172 Ill. 204. According to the great weight of authority in this country, the sale of corporate stock is held to be within the statute of

frauds. 25 R. C. L. 616, ¶ 230; 14 C. J. 238; *Hinchman v. Lincoln,* 124 U. S. 38, 31 L. Ed. 337; *Davis Laundry & Cleaning Co. v. Whitmore,* 92 Ohio St. 44, 110 N. E. 518, Ann. Cas. 1917 C 988; *Franklin v. Matoa Gold Min. Co.,* 158 Fed. 941, 16 L. R. A. (N. S.) 381; *Sprague v. Hosie,* 155 Mich. 30, 118 N. W. 497, 19 L. R. A. (N. S.) 874; *Meeham v. Sharp,* 151 Mass. 564, 24 N. E. 907; *Hewson v. Peterman Mfg. Co.,* 76 Wash. 600, 136 Pac. 1158, 51 L. R. A. (N. S.) 398; *Spencer v. McGuffin* (Ind.), 130 N. E. 409. In the last case cited the court, after citing the English rule to the contrary, based upon the statute 29 Car. II, ch. 3 (1677) holds: "But in America there never has been a reported decision of a court of last resort, of which we have knowledge, holding that sales of stock that has been actually issued are not within the statute." There is a contrariety of holdings and some very respectable authority that the rule does not apply to a subscription for unissued stock. 14 C. J. 520; 27 C. J. 238. Appellant, in its brief and argument, practically concedes the state of the law and contends: "If corporate stock has been once issued and is then the subject of sale or contract of sale from one person to another, the weight of authority in the United States is that the same comes within the statute of frauds regulating the sale of goods, wares and merchandise. There is a distinction, however, as to a subscription for or a purchase of unissued stock from the corporation and the decided weight of authority is that such sales or subscriptions are not within such statutes." Upon the latter question we express no opinion, and it must be borne in mind that appellant has brought suit, not upon the stock subscription, called the underwriting agreement, but upon the note, based upon a purchase of 40 shares of stock, independent of said stock selling campaign and the subscription agreement signed by the 135 citizens of Danville, including appellee. The 40 shares, by appellant's second replication to

the fifth plea, appellee purchased from the appellant corporation, and gave the note therefor. It becomes pertinent to inquire whether the 40 shares purchased, as set out in appellant's replication, was unissued stock, subscription stock or actual stock owned by the corporation, which it had the right to sell, the same as any stockholder. What is unissued stock? In 14 C. J. 383, various cases are cited and the subject discussed. It is held: ''Actual stock is stock which has been subscribed for and which has either been paid in or is subject, under legal compulsion, to be paid in, while potential stock is merely the power under the charter or governing statute to acquire a capital stock. Merely authorized capital stock has no existence or validity until it is actually issued or subscribed for. * * * If capital stock has been issued or subscribed for it is actual and valid stock, although it may not have been actually paid in, and in such case it is within the term 'capital stock,' as employed in a statute, unless, as is sometimes the case, there is something to show an intention to refer to paid up capital only.''

In *Sturges v. Stetson,* 1 Biss. (U. S.) 246, it was held:

''The corporate powers of the company were conferred for the express purpose of creating stock as a means of constructing the railroad. As well might the route for the road designated be called a railroad, as to call the corporate means of creating the stock, stock. * * * Stock can be created only by contract, whether it be in the simple form of a subscription or in any other mode. There must be an agreement to take the stock, and nothing short of this can create it. This imparts to the stock the quality of property, which before it did not possess. It is called capital stock in the charter, because the corporate capacity to create it is given. The term stock, as used in the charter, before it is taken by subscription, means

nothing more than a power in the directors to receive subscription for stock."

Again, in 14 C. J. 406, the authority seems to be ample that: "There is a difference between actual and potential stock and authorized capital stock has no existence or validity until it has been actually issued or subscribed for, although it need not have actually been paid in. Stock which has not been subscribed for, although authorized, cannot be an asset of the corporation or used for any purpose and neither the corproation, nor anyone else can be liable upon it." It is held: "As to unissued stock which a corporation is under obligation to issue to a person for property, which has been conveyed by him to the corporation, it is a mere trustee." *Wait v. Kern River, Mining, Milling & Developing Co.,* 157 Cal. 16, 106 Pac. 98. "Stock which once has been legally issued by a corporation and which has been reacquired by it by purchase or donation cannot be regarded as unissued stock in the proper sense. It belongs to the corporation like its other assets and, subject to charter or statutory restrictions, may be disposed of by sale or otherwise as it may see fit, for any legitimate corporate purpose and reissued. Such a reissue is not a creation of new stock within the meaning of charter clauses relating to original subscriptions, nor does it constitute an overissue. Stock which has been forfeited to the corporation may be treated as unissued stock for particular purposes (for purposes of reduction of capital stock) but it is not unissued stock in the proper sense, for it has been issued." 14 C. J. 407.

It has been held that a corporation may, without express authority, acquire shares of its own stock by way of bequest or by receiving them in satisfaction of debts which cannot be collected in any other manner. Morawetz on Corporations, sec. 231. It is further held in Morawetz on Corporations, sec. 260:

"The contract between the different subscribers depends for its validity upon the statute under which the corporation is formed and not merely upon the common law, and it seems but a reasonable inference that the intention of the legislature in providing for the opening of stock books was to make a subscription binding from the time it was made." And section 262: "A person may become a shareholder in a corporation already in existence by an increase of the number of its shares. In such, the relation between the members of the company becomes altered, a new party being added to their original contract. Where shares are subscribed under a statute for the purpose of forming a corporation, the engagement between the subscribers is mutual, and its result is the formation of a corporate association. But, if a corporation issues new shares after having been fully formed and organized, the original members do not act individually in entering into the contract of membership with the purchasers of the new shares; in such case the whole company acts in a corporate capacity through the common agents. The contract must therefore be treated as a contract between the corporation on the one hand and the subscriber on the other; and this contract does not constitute the subscriber a shareholder until the company has issued a certificate, or in some other manner recognized the subscriber as a member."

Under the guide of these authorities it seems to be the settled rule that actual stock, or issued stock, is stock which has been subscribed for and which has been paid in or is subject, under legal compulsion, to be paid in, and it is not necessary that the actual certificate should have been issued. One who is a member or stockholder in a corporation must be the owner of issued stock. Unissued stock is merely authorized capital stock which has not been subscribed for and is not sold, although there might exist a contract of

sale. Applying these rules to the case at bar, there is no evidence in this record that appellee purchased unissued stock or potential stock, other than actual stock issued and in existence upon October 21, 1919. It is not certain from appellant's pleadings and evidence just what stock was contracted to be sold to appellee, but from some of appellant's testimony it may be inferred that the stock sold was a portion of the stock subscribed for in March and April, 1919, by some of the 135 subscribers, citizens of Danville, who were not as able financially to carry the stock as appellee. It is certain, under appellant's second replication to the fifth plea, that the stock sold appellee on October 21, 1919, was other and different stock from that subscribed for by appellee in March and April, 1919, and from any sold during the "selling campaign" in July and August of the same year. From the testimony, all of appellant's stock had been subscribed for prior to July, 1919, and it follows that appellee's purchase on October 21, 1919, could not have been a subscription for unissued stock.

Much confusion is caused in this case by appellant's argument being based upon a stock subscription. Appellant's pleadings and testimony exclude that ground of recovery if it should be held a legal ground for a recovery. It must be held under the pleadings and testimony of the case that the stock which was the subject of contract between appellant and appellee was actual, issued and existing stock in said corporation. The giving of a promissory note is not payment of the purchase-money or a part thereof, within the statute of frauds. 27 C. J. 255, ¶ 302.

In construing uniform acts the language ought to be interpreted in such a way as to give effect to the beneficent design of the legislature in passing an act for the promotion of harmony in the law. *Sherer-Gillett Co. v. Long,* 318 Ill. 432; *National City Bank of Chicago v. National Bank of Republic of Chicago,*

300 Ill. 103; *Commercial Nat. Bank v. Canal-Louisiana Bank & Trust Co.,* 239 U. S. 520.

It appearing that the transaction in question comes clearly within the provisions of section four of the Uniform Sales Act [Cahill's St. ch. 121a, ¶ 7], the judgment of the circuit court of Vermilion county is affirmed.

*Affirmed.*